IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KENDALL RAYE ROGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C. A. No. 05-721-KAJ |
| ) | |
| STATE OF DELAWARE, ) | |
| DEPARTMENT OF PUBLIC SAFETY/ ) | |
| DMV, ) | |
| ) | |
| Defendants, ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S INTERROGATORIES**

**DIRECTED TO DEFENDANT**

1. Why did you send me to New Castle, when an agreement had been made stating there would be no retaliation?

ANSWER: Mr. Rogers was temporarily transferred to the Dover Driver License Section due to knee surgery that temporarily prevented him from performing the duties he was hired to perform in the Dover Inspection Lane. At no time was he informed that this was a permanent transfer due to the fact that the Dover Driver License Section was fully staffed and had no vacant positions. When Mr. Rogers presented the Division with a doctor's note stating he could no longer perform his job at the Dover Inspection Lane, a decision had to be made concerning Mr. Rogers' employment. A statewide hiring freeze was in affect for all State employees; therefore, the Division could not replace employees who left employment with the Division. Mr. Rogers was transferred to the New Castle Office because the Dover Office was fully staffed and New Castle had two vacancies due

to the retirement/death of New Castle Office employees. These positions could not be filled due to the hiring freeze, and as a result, customer waiting times for driver services at the New Castle Office were extremely long resulting in numerous complaints from Delaware citizens. Mr. Rogers was being temporarily accommodated with a position in the Driver License Section due to his knee surgery. Mr. Rogers was an addition to an already fully staffed office. Retaliation had nothing to do with the transfer. In fact, the agreement to which Mr. Rogers is referring was not even signed until June 4, 2004 (see attached agreement). This is well after Mr. Rogers had been transferred to New Castle and is after he had been transferred back to Dover when a vacant position became available. The agreement was the result of an EEO complaint Mr. Rogers made against the Department of Public Safety Human Relations concerning his return to work following his knee surgery.

2. Why was I sent to New Castle although there were more experienced techs with less seniority than me in the same position?

ANSWER: As stated in the answer to question 1, Mr. Rogers was "extra" staff in the Dover Office; moved from the Inspection Lane to Driver License temporarily to accommodate his disability. Therefore, he had no "seniority" in the Driver License Section. The Division did not have a position in the Dover Driver License Section, and, therefore, could not permanently move him into that section without action from State Personnel to create another position. A hiring freeze was in affect at that time; therefore, the Division could not even attempt to create another position. Mr. Rogers also had to be trained for the duties in Driver License Section and could be trained as well at either office.

3.      The State of Delaware Merit system used seniority as a rule for job situations. Why wasn't it used in my transfer to New Castle?

ANSWER: Merit Rule 10.6 regarding Transfer does not address seniority. The Merit Rules state: "To promote the efficiency of the service, unrelated to employee performance, employees may be transferred to another position for which they meet minimum qualifications in the same pay grade within the same agency without competition." In addition, Merit Rule 1.4 states: "The State has the exclusive right to manage its operations and direct employees except as specifically modified by these rules." The Division has always managed operations by moving employees from one location to another to meet operational needs. This becomes critical due to hiring freezes or hiring slowdowns when one lane[1] may be impacted more than other lanes due to retirements or other loss of employees. The Division has temporarily or permanently moved managers, supervisors, and staff employees to other locations to meet the needs of the facility and our customers. As stated in the answer to Question 2, Mr. Rogers did not have "seniority" nor was he permanently assigned in the Driver License Section.

4.      When I returned to Dover why wasn't another technician sent to New Castle since you and your staff said someone had to be sent to New Castle?

ANSWER: On or about February 10, 2003, Michael O. McCann, Chief of Administration at DMV, met with Mr. Rogers to discuss his transfer to New Castle County. During that conversation, Mr. McCann promised Mr. Rogers that he would be returned to Dover as soon as the hiring freeze was lifted, a vacant position was available at Dover and new staff could be hired for New Castle. The freeze was lifted on

---

[1] At the Department of Motor Vehicles, we sometimes refer to our inspection/approval facilities as "lanes." There are four such facilities, in Georgetown, Dover, and two in suburban New Castle County.

December 16, 2003, and Mr. Rogers returned to Dover in March of 2004. There was no need to send someone else up from Dover as new staff had been hired.

5.  What was your intent when you agreed that there would be no retaliation?

ANSWER: The agreement Mr. Rogers signed on June 4, 2004, concerning retaliation was well after he had been transferred to New Castle and returned to Dover. Mr. Rogers' transfer to New Castle was done to meet the operational needs of the Division and to move him from an overstaffed section to a section in desperate need of employees.

6.  What date and time was it that your staff asked the co-workers in the department if anyone would volunteer to transfer to New Castle permanently?

ANSWER: On or about January 23, 2003, Art Ericson directed Martin "Bucky" Stapleton to request a volunteer from the Dover Motor Vehicle Techs to work in New Castle due to the backlog of road tests in that office. The request was made verbally to five employees, all of whom declined. Mr. Stapleton reported this to Mr. Ericson on or about January 27, 2003. The Division tries to find volunteers when at all possible when moving employees from one location to another. This is not always possible depending on the needs of the section and the qualifications of the employees.

7.  Why did you decide to return me to Dover when the transfer was suppose [sic] to be permanent?

ANSWER: Mr. Rogers' transfer was only "permanent" for the duration of the hiring freeze. He was promised a return to the Dover Office at the end of the hiring freeze, and was brought back to Dover as soon as possible after the freeze was lifted and a vacant position was available at Dover.

8.  Who was the members [sic] of the Special Committee?

ANSWER: Defendants are unaware of any "special committee."

9. When you met with the Special Committee did they know you had made an agreement not to retaliate?

ANSWER: See answer to question 8 above.

10. Explain how the transfer was under the merit rules?

ANSWER: See Question 3.

11. Why wasn't I transferred before the "no cause finding"?

ANSWER: We can only assume that Mr. Rogers is referring to the June 4, 2004, agreement. Mr. Rogers was transferred to New Castle in early 2003 and transferred back to Dover in March 2004. This all occurred well before the settlement agreement related to a prior complaint was negotiated and signed by Mr. Rogers and the Division's then-Deputy Attorney General.

    State of Delaware

    /s/ *Frederick H. Schranck*
    Frederick H. Schranck (ID #925)
    Deputy Attorney General
    P.O. Box 778
    Dover, DE  19903
    (302) 760-2020
    Attorney for State Defendants

DATE: August 31, 2006