--- F.3d ----                                                                                                          Page 6

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
**(Cite as: --- F.3d ----)**

Moroney's conduct as a supervisor. Myrna Moore, a black female officer, told William that she thought that Moroney was "blatantly a racist" and that he assigned her white counterparts to work in the building while she had to work outside in the cold. App. at 298. William relayed that conversation to Moroney in what he later described as an effort to "forewarn" Moroney. Moroney replied that William could "tell that critter to do what she has to do." App. at 193. In another incident, William and Moroney heard an African-American officer's voice on the police radio, to which Moroney commented: "Why do they continue in hiring these niggers? They are stupid as sin." App. at 156. William responded: "I don't appreciate that. You're held to a higher standard than I am." *Id.* Carnation observed Moroney being rude to black officers, not socializing with them as he did with white officers, bragging about "sick checking" one black officer late at night, making jokes about black officers being "stupid" or "slow," and ridiculing a black officer for being hospitalized after choking on a chicken bone. App. at 891-92.

*3 At the same time, other workplace tensions began to develop for the plaintiffs in this case. In late 1997, Michael overheard five or six colleagues in the 7-squad discussing how to get more overtime by having each officer say they were involved in a drug arrest so that each would be called into court. Michael immediately reported this "piling-on" scheme to Moroney and Moroney immediately went into the squad room where the discussion had occurred. Shortly thereafter, Moroney imposed a rule there would be no more than two officers allowed to participate in a drug arrest. A few days after this incident, Michael saw graffiti on the walls of the bathroom that included his name and words like "rat," "asshole," and "snitch." The word "rat" was written on Michael's time sheets and other paperwork.

At some point after William and Carnation reported the numerous problems they had with fellow officers to Moroney, the other officers began to refer to Carnation and William as "rat" and "snitch" over the radio and make "rat noises" in front of them. In December 1997 or January 1998, the bathroom was covered in graffiti referring to Carnation and William as "rats," "snitches," and "pussies," and noted that the two officers "belong in a rat hole." The words "rat # 1" was written on William's January 1998 time sheet.

C. Complaining About Moroney's Conduct

In October 1997, William and Carnation first raised concerns about racial tensions in the squad to their superiors. In that month, William and Carnation were shot at while on their beat. The suspects were apprehended by other police officers within a minute and a half. Five minutes after the shooting William and Carnation were relieved so that they could give a statement as to what had happened. Their temporary sergeant supervisor recommended commendation for their role in the shooting. Within a week of the shooting, they had a meeting with Captain Colarulo and Lieutenant Frank Bachmeyer to express concern that they did not receive back-up after the shooting quickly because "we felt that it was the blacks were being singled out ... and because of our association with the black officers, we weren't getting the backup, like, we would have been, if I guess, we didn't associate with them." App. at 274.

In November 1997, William and Carnation slipped a note under Colarulo's door requesting a meeting to discuss why the request for commendation in connection with the shooting had been denied. They requested that Moroney attend the meeting, but he did not do so. William and Carnation discussed with Colarulo various concerns they had about the operation of the 7-squad, including that "there was certain black officer[s] that were having problems with Sergeant Moroney." App. at 629. At that point, they were simply reporting the situation to supervisors.

However, in subsequent meetings with their superiors, all three plaintiffs made clear that they opposed Moroney's expressions about and conduct towards their African-American colleagues and were concerned that their position was being held against them by Moroney. In a December 1997 meeting with Bachmeyer and Moroney, Carnation and William complained-among other things-that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                  Page 7

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
**(Cite as: --- F.3d ----)**

Moroney was treating black officers unfairly and that they were being treated in the same manner because they had attempted to resolve problems between Moroney and the black officers.

*4 In late December 1997, Michael also met with Bachmeyer and told him about the situation regarding the graffiti in the bathroom in which he was named as a rat and a snitch and relayed his concern about Moroney's persistent use of the term "nigger" to refer to black officers. Bachmeyer suggested that he report this information to Colarulo. Michael met with Bachmeyer and Colarulo and relayed his concerns about the graffiti and about Moroney's comments regarding the black officers. Among other things, Michael related the incident with Moore in which Moroney ordered him to stand in the rain with Moore because Michael had challenged Moroney's treatment of her. After this discussion, Colarulo took certain actions regarding the graffiti, including ordering the walls painted and threatening that future graffiti would be dealt with through departmental discipline or criminal charges.

On February 5, 1998, Carnation was working outside in the cold. After asking for relief from coworkers and receiving none, he walked away from his post to get something to eat and drink. While he was walking away, Moroney called him on the radio to request his location. When Carnation explained, Moroney ordered him back to his post. After returning to his post for another hour, Carnation told Moroney that he could not handle it any more and went home. The next day, Carnation was told to report to Colarulo's office. Carnation went to the captain's office, where Colarulo, Bachmeyer, and Moroney awaited his arrival:
[Colarulo] started screaming at me saying that I left my post, and if I keep this behavior up, he's going to transfer me to the farthest district from my house. He can make my life a living nightmare if I make an EEOC complaint. How dare I accuse Sergeant Moroney of being unfair to the black officers and just the whole speil like that....
[Q: So Captain Colarulo brought up complaints on behalf of black officers?] He said if I make an-because I spoke to him prior to this, and he said: If I make an EEOC-he picked up the phone at the meeting. He said: If I pick up this phone and make an EEOC complaint, he goes, I'll make your life a living nightmare. This is what he's saying to me. And I'm like I don't know what to do. So I kind of broke down a little bit....
[H]e kept telling me to apologize to Sergeant Moroney. I'm like, apologize to Sergeant Moroney[?] Yeah, accusing him of doing something and something. And I'm like: Captain, I said, don't take it from me. Isaid: Talk to your officers downstairs. I said: Talk to Bruce Smith [African-American officer] He wouldn't talk-I said: Ask him. Don't take my advice.... And I asked him if I can be transferred. He's like: I'm not transferring you. I'll transfer you to the farthest district when I feel I want to. He was dictating me. Then he's bragging ... that he could have me where ever he wants me because all he has to do is make a phone call.

App. at 914-15. Carnation described Colarulo as warning "in a loud tone of voice ... that [Carnation] better have proof that Sgt. Moroney was harassing certain individuals." App. at 833-34. While Moroney remained silent during this meeting, Carnation described Bachmeyer as having "chimed in a little bit just stating that I was wrong and I'm creating trouble and things like that." App. at 915.

D. Reactions to Complaints

*5 After having initially complained to Moroney, all three plaintiffs reported that their treatment by Moroney worsened. After William and Carnation first confronted Moroney about racial problems in the 7-squad, Carnation recalled that they would not receive lunch breaks and other breaks as other officers would, that Moroney would discuss their personal lives in front of other officers and that "the demeanor towards us was totally different." App. at 891. William noted that Moroney would "keep a close eye on my location" and Carnation's location and that Moroney made derogatory remarks about him. App. at 942. Michael described that he received less desirable work assignments after having confronted Moroney about his use of racial epithets. App. at 1183-84.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                            Page 8

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
**(Cite as: --- F.3d ----)**

After Colarulo threatened Carnation that if he made an EEOC complaint he would make his life a living nightmare on February 6, 1998, each of the plaintiffs had their share of workplace troubles. Within weeks, the McKenna brothers were both transferred from the 7-squad and all three eventually were not employed by the police department.

Early in the morning of February 14, 1998, William was overheard declaring that Moroney "should be shot for what he does to us, and everybody else, and what he says about us, and everybody else." App. at 1312. When William returned to work later that day, his service weapon was immediately confiscated and he was assigned to work in the operations room rather than his normal assignment. Colarulo ordered William to undergo a psychiatric examination and, after an investigation, William received a 30-day suspension as a result of the incident. On February 17, 1998, Colarulo told William that he was being transferred to the 12th District. William immediately requested and received restricted duty. On February 20, 1998, William received a performance evaluation from Moroney in which he received satisfactory ratings in all categories except for "relationship with others, effectiveness in dealing with the public, other employees" where he was deemed unsatisfactory. App. at 962.

In November of 1998, William's restricted duty was cancelled and he was placed on medical leave. He had been on restricted duty status for seven months at that point. The Philadelphia Police Department's policy was to permit only six months of restricted duty. The department also has a policy of performing "sick checks" on officers claiming medical leave in which a supervisor comes to the home of an officer who is out sick and the officer is required to present himself or herself and sign a form. Between November 1998 and March 1999, the department performed three sick checks of William. He filed this lawsuit in early March 1999. Between March 1999 and May of 1999 the department performed approximately 30 sick checks-one almost every other day. After he failed five sick checks, William was dismissed.

After February 1998, Michael McKenna also did not last long in the 7-squad and also eventually left the police force. As noted above, early in the morning of February 14, 1998, William (Michael's brother) said that Moroney "should be shot." At around 6:45 p.m. that day, Michael heard Moroney threaten that he would "kick [Michael's] ass" and "kick [William's] ass." App. at 1327. Fifteen minutes later, Michael was assaulted by a fellow police officer. Michael's wrist was fractured when he fell in the course of the assault. In mid-February 1998, Michael was transferred to the 19th District, without the 30-days required notice. Colarulo later explained that "[Michael] was detailed out of the 25th District for his safety, the safety of others, and the safety of the public." App. at 1268. The assaulting officer was not transferred from the 7-squad. On February 20, 1998, Moroney gave Michael a performance evaluation in which Michael received satisfactory ratings in all categories except for "relationship with others, effectiveness in dealing with the public, other employees," where he was assessed unsatisfactory. Michael had never before received an unsatisfactory rating in a performance evaluation. In fact, he had received commendations from the department, positive attention in the news media, and numerous positive letters from citizens praising his work as a police officer in the 25th District. Moroney admitted Michael's record of good community relations when he wrote in the evaluation that "though you have good rapport with individuals in your assigned area, you have difficulty getting along with co-workers and your supervisor." App. at 1421.

\*6 In June 1998, Michael filed a private criminal complaint against the officer that assaulted him, another officer present at the scene, and Moroney. Police department policy prohibits officers from filing such complaints, instead opting for a system where they are handled internally. The District Attorney did not prosecute the complaint and the internal affairs division investigated the filing of this complaint in June 1998. Michael was ultimately discharged by the police force in October of 1999.

Ray Carnation remained at the 7-squad after both McKenna brothers were transferred from the unit. By mid-February 1998, both William and Michael

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 9

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

had been transferred from the squad. On March 25, 1998, Moroney failed to give Carnation a court notice. When Carnation brought this to Moroney's attention "he just smiled" and when Carnation brought this incident to Bachmayer's attention, no action was taken. App. at 834. On April 10, 1998, Carnation observed Moroney talking to several officers and was told after the meeting to "watch yourself" because Moroney was "out to get you." App. at 834.

In May 1998, Carnation requested and was granted restricted duty at the Police Academy. He also filed an internal grievance against Moroney, Bachmeyer, and Colarulo. In late May 1998, Carnation learned that Colarulo stated under oath in the police board inquiry into the McKenna disciplinary action that Carnation was not aware of problems between William, Carnation and Moroney. When Carnation confronted Colarulo about the statement "he started yelling at me saying it's none of my business ... what was said and what was not said." App. at 916-17.

On Friday of Memorial Day weekend, 1998, Carnation called Moroney several times to discuss this situation. Moroney did not take the call. Rather, Carnation received a return call from Colarulo from his shore house in which Colarulo said: "who the fuck do you think you are calling him and trying to do this and trying to do that." App. at 918. On Saturday, Carnation called Moroney three or four times, and on the last time he spoke with Moroney. After Carnation got off of the call, he called Colarulo at his shore house from the caller identification stored on his phone. On July 10, 1998, Colarulo personally served Carnation with disciplinary papers for the Memorial Day weekend incident. Carnation alleges that these disciplinary papers included two false statements-first, that Carnation admitted to knowing he was not supposed to call Moroney and second, that Carnation threatened another Sergeant that he would take retribution for what happened to the McKennas and to him.

During the summer of 1998, Colarulo also intervened in Carnation's child custody dispute with the mother of his child. The mother of his child said that when she first contacted Colarulo in January of 1998, Colarulo was reluctant to become involved. However, in the summer of 1998, she received "a different response" as "she was welcomed to talk to him, as [Colarulo] indicated to her that he would do anything to help her and her daughter." App. at 990. Colarulo pressed the mother for information about whether Carnation was drinking, did drugs, or had heard of his recent hospitalization.

E. Litigation

*7 On April 29, 1998, Michael, William, Carnation, and three African-American officers from the 7-squad filed a complaint with the Pennsylvania Human Relations Commission and the EEOC. On November 4, 1998, Michael filed a civil rights lawsuit against the City of Philadelphia and various individual defendants. On March 5, 1999, William and Carnation-along with the three African-American officers-filed a separate lawsuit against the City of Philadelphia and various individual defendants. The City of Philadelphia settled the discrimination claims brought by the three African-American plaintiffs. Following consolidated discovery, the District Court granted summary judgment in favor of the defendants in Michael's lawsuit and William and Carnation's lawsuit.[FN2]

II.

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. Where the District Court grants summary judgment, "[o]ur review is plenary, and we view the facts in the light most favorable to" the non-moving party. *Jensen v. Potter,* 435 F.3d 444, 448 (3d Cir.2006). "If a reasonable jury could find for" the party against whom summary judgment was granted "we must reverse." *Id.*

[1] Title VII provides:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.