--- F.3d ----                                                                                                   Page 10

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995).

[2][3] With respect to "protected activity," the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the "participation clause") and those who oppose discrimination made unlawful by Title VII (the "opposition clause"). *Slagle v. County of Clarion,* 435 F.3d 262, 266 (3d Cir.2006). Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. *Clark County v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complained about "violated Title VII's standard" for unlawful discrimination); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir.1996) (retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a violation existed"). Moreover, the employee's " opposition" to unlawful discrimination must not be equivocal. *Barber v. CSX Distribution Servs.,* 68 F.3d 694, 702 (3d Cir.1995).

*8 As for the second element of the *prima facie* case, the Supreme Court recently clarified what plaintiffs must show to make out retaliation claims under Title VII. *See Burlington N. & Santa Fe Ry. Co. v. White,* ---U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Until recently, we required those claiming unlawful retaliation under Title VII-like those claiming discrimination made unlawful by that provision-to show an "adverse employment action" that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) (internal quotation marks omitted). Employees claiming retaliation by workplace harassment, therefore, were required to show retaliatory harassment that was "severe or pervasive enough to create a hostile work environment" that would violate the anti-discrimination provision of Title VII in order to violate Title VII's protection from retaliation. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006).

[4] In *Burlington Northern,* decided after the District Court's opinion in this case, the Supreme Court disagreed with a formulation like the one we adopted in *Robinson* and *Jensen.* 126 S.Ct. at 2410 (citing *Robinson,* 120 F.3d at 1300, as an example of this standard). It found that the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, and accordingly, "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. Because the discrimination and retaliation provisions "are not coterminous," the Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 2414. Consistent with this view, the Court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415.

[5] To establish the third element of the *prima facie* case, as clarified in *Burlington Northern,* a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. "Many may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 11

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

Title VII provides no relief." *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir.2006). This third element " identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* at 449-50. "The ultimate question in any retaliation case is an intent to retaliate *vel non.*" *Id.* at 449 n. 2.

*9 If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir.1997). To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

[6] Contrary to the conclusion of the District Court, under this governing law, the fact that the plaintiffs are white is not a "threshold problem" for their retaliation claims. While white workers may be unable to successfully complain under the antidiscrimination provision of Title VII solely because they are required to work in an environment hostile to blacks,[FN3] if they became the victims of "materially adverse actions" because they reasonably perceived that environment as violative of Title VII and objected, they have a valid retaliation claim. *See* 42 U.S.C. § 2000e-3(a) (making it unlawful to discriminate against an employee who "has opposed any practice made an unlawful employment practice by this subchapter" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"); 2 EEOC Compliance Manual § 8, p. 8-2 (1998) *available* at http://www.eeoc.gov/policy/docs/retal.pdf (as visited Aug. 1, 2006) ("A charging party who alleges retaliation under Title VII ... need not also allege that he was treated differently because of race, religion, sex, national origin, age, or disability. "). *See also Burlington N. & Santa Fe Ry. Co.,* 126

S.Ct. at 2412. ("The substantive [anti-discrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct."). That is precisely what these plaintiffs claim here. Title VII's whistle-blower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.

III.

We will reverse the District Court's grant of summary judgment because we conclude that the plaintiffs have raised genuine issues of material fact about whether the defendants have violated Title VII's anti-retaliation provisions.

A. Employee Opposition to Unlawful Discrimination

[7] By late-December 1997 there is evidence from which a factfinder could reasonably find that all three plaintiffs had made clear to Moroney, Bachmeyer and Colarulo that they objected to Moroney's remarks and treatment of African-American officers. While the plaintiffs had not yet "participated in" a Title VII proceeding, they had "opposed" unlawful discrimination by expressing their criticism of their supervisor's conduct to their supervisor and up the chain of command.

*10 "Opposition" to discrimination can take the form of "informal protests of discriminatory employment practices, including making complaints to management." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir.2006). To determine if retaliation plaintiffs sufficiently "opposed" discrimination, "we look to the message being conveyed rather than the means of conveyance." *Id.*

Carnation and William complained to Bachmeyer-Moroney's supervisor-in front of Moroney that Moroney was treating black officers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 12

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

less favorably than white officers. They relayed specific stories to evince Moroney's derogatory comments about black officers such as the "critter" comment and complained that they were being treated in the same manner because they had attempted to resolve problems between Moroney and the black officers. In late December 1997, Michael also met with Bachmeyer and later with both Bachmeyer and Colarulo to relay concerns, including concerns about Moroney's treatment of black officers. He, too, relayed specific instances-such as the order to stand outside in the rain with Moore after having challenged Moroney's treatment of her. There was nothing vague or equivocal about the plaintiffs' criticism of Moroney-these plaintiffs opposed Moroney's supervision of the black officers on the squad and they complained both to him and to his supervisors. FN4

Furthermore, the fact that these plaintiffs had made their opposition to unlawful discrimination clear to their superiors was plainly revealed around a month later. We find it difficult to imagine a Title VII plaintiff producing stronger evidence of retaliatory animus than Carnation's account of his conversation with Colarulo on February 6, 1998. On that date, the captain of Carnation's district called him into his office-in the presence of Carnation's sergeant and lieutenant-on an unrelated matter and expressly threatened Carnation with retaliation if he filed an EEOC complaint about Moroney's treatment of black officers. Carnation recalled that Colarulo declared that he would "make my life a living nightmare if I make an EEOC complaint" and asked "How dare I accuse Sergeant Moroney of being unfair to the black officers?" A reasonable factfinder could conclude that Colarulo's comments revealed that the plaintiffs' supervisors viewed the plaintiffs as having allied with black officers, wanted to suppress or undermine any discrimination lawsuits that might arise, and were willing to take action against the plaintiffs for having complained in the first place and in order to keep their complaints from going any further. Given that William and Michael were so closely associated with Carnation, a factfinder could reasonably infer that this threat was not specific to Carnation.FN5 Colarulo essentially announced a policy, in front of the supervisors who could carry it out, to silence the voices that had opposed Moroney's conduct. The message was clear-opposition to Moroney's racial discrimination needed to stop, and Colarulo was going to make it stop by silencing these officers rather than by disciplining or removing Moroney.

*11 This conversation is significant to our analysis of both the first and third prong of the *prima facie* case the plaintiffs must satisfy. The conversation makes clear that Colarulo perceived that the plaintiffs had engaged in protected conduct when they had complained about Moroney's treatment of black workers. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 565 (3d Cir.2002) ("[Employee's] perception theory of illegal retaliation-that he was fired because Mercy *thought* that he was engaged in protected activity, even if he actually was not-presents a valid legal claim.... [I]t does not matter whether the factual basis for the employer's discriminatory animus was correct and that, so long as the employer's specific intent was discriminatory, the retaliation is actionable."). As discussed below, this evidence would also support a finding that certain actions taken against the plaintiffs were animated by a retaliatory motive rather than some other reason.

We also conclude that the plaintiffs opposed conduct that a reasonable person could believe violated Title VII's standard for unlawful discrimination. As we have noted, retaliation plaintiffs must "act[ ] under a good faith, reasonable belief that a violation existed." *Aman v. Cort Furniture Rental Corp.*, 85F.3d 1074, 1085 (3d Cir.1996). However, a victim of retaliation "need not prove the merits of the underlying discrimination complaint" in order to seek redress. *Id.* We need only determine whether a reasonable person in these officers' circumstances could conclude that black officers in the 7-squad were suffering discrimination made unlawful by Title VII.

The treatment of African-American officers in the 7-squad observed by these plaintiffs easily meets this standard. These plaintiffs witnessed their direct supervisor repeatedly use derogatory racial epithets about black police officers. Their supervisor's racial epithets were accompanied with his directly linking

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                           Page 13
--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

his attitudes towards black officers with his managerial decisions-e.g., leaving the black female officer on the street on her own to "punish" her, " sick checking" one black officer late at night, and saying he was "going to get" one black officer. He expressed dismay that other managers did not share his views of black officers and did not manifest those views in their decision-making, asking aloud why his colleagues in management continued to hire black officers since they are "stupid as sin." When the plaintiffs objected to his comments, he did not relent and, in one instance, put Michael in the rain with a black officer Moroney claimed to be punishing after Michael stood up for her so that Michael would "see how it's like to work with a n igger." Moroney, thus, persistently used racially-charged epithets in a manner that would support an inference that he was actively discriminating against black officers in the workplace. In addition, William and Carnation report hearing from black officers themselves that they were mistreated. One African-American officer told William that Moroney was "blatantly a racist" because of the disparate manner in which Moroney assigned shifts to black and white officers and another black officer told Carnation he was "fed up" and "hopeless" about the way Moroney was treating black officers. App. at 298, 613. This case is not comparable to an employee claiming retaliation for having opposed unlawful discrimination by complaining to supervisors about a single instance in which a co-worker made a sexually explicit joke. *See Clark County v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). The evidence of unlawful discrimination in this case is far more substantial.

*12 We do not agree with the District Court's conclusion that, while plaintiffs' evidence would support a finding that their supervisors used racial epithets out of the presence of black officers, it would not support an inference that the black officers themselves experienced discriminatory treatment. In addition to the fact that there is direct evidence of racial discrimination against blacks, as we have explained, we note as well that evidence of unlawful discrimination may be direct or indirect, and may manifest itself in the presence of the victims or behind their backs.[FN6] As soon as a witness of such conduct reasonably believes unlawful discrimination has occurred, the anti-retaliatory provisions will protect their opposition to it. They are not required to collect enough evidence of discrimination to put the discrimination case before a jury before they blow the whistle.

### B. Employer Reaction to Opposition to Discrimination

[8] Having found these plaintiffs to have tendered evidence supporting the proposition that they opposed reasonably perceived unlawful discrimination, we now turn to the issues presented by the second and third elements of plaintiffs' *prima facie* case and by the final step in the *McDonnell Douglas* analysis. We must determine-for each individual officer-whether the supervisors in this case reacted to that opposition by taking "materially adverse" actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* --- U.S. ----, ----, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). In evaluating whether actions are materially adverse, we must remain mindful that "it is important to separate significant from trivial harms" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.See also Jensen,* 435 F.3d at 451 (" [Title VII] does not mandate a happy workplace."). Furthermore, we must "identify what [materially adverse actions] ... a reasonable jury could link to a retaliatory animus" for each individual officer. *See Jensen,* 435 F.3d at 449-50. Finally, we must determine if the plaintiffs tendered sufficient evidence to overcome the non-retaliatory explanation offered by their employer. *Krouse,* 126 F.3d at 500-01. These determinations depend on the "totality of the circumstances," *Jensen,* 435 F.3d at 452, as "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.