--- F.3d ----    Page 14

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

*City of Phila.,* 895 F.2d 1469, 1484 (3d Cir.1990).

### 1. William McKenna

A reasonable jury could conclude that William's supervisors took actions against him that might well dissuade a reasonable worker from filing or supporting a charge of discrimination. On February 14, 1998, nine days after Colarulo promised to make Carnation's life a "living nightmare" if he filed an EEOC complaint, William was disciplined for commenting that Moroney "should be shot for what he does to us, and everybody else, and what he says about us, and everybody else." App. at 1312. The plaintiffs insist that William's comment was a casual one not intended literally. The defendants disagree, but we take the facts in the light most favorable to the plaintiffs at this stage in the litigation. A factfinder, we believe, could reasonably conclude that the discipline William received-having his weapon stripped from him, having his duties changed, being ordered to undergo a psychiatric evaluation, receiving a negative performance evaluation, receiving a 30-day suspension, and being transferred from 25th District-was an overreaction and inappropriately severe discipline. Given Colarulo's threat on February 6, 1998, a reasonable jury could further conclude that this inappropriately severe discipline was caused by retaliatory animus.

*13 We also conclude that, while William's supervisors may have had a legitimate non-retaliatory reason for imposing some discipline, the final step of the *McDonnell Douglass* test is satisfied with regard to the disciplinary actions they in fact took against William. Even though disciplining an officer for workplace infractions would normally be a strong legitimate reason to overcome, the unusually strong evidence of retaliatory animus in this case-Colarulo's "living nightmare" threat-would allow a factfinder to reasonably conclude that William's supervisors went beyond legitimate discipline and were actually motivated by retaliatory animus. It would not be unreasonable for a jury to conclude that a supervisor who had explicitly threatened that he planned to quash complaints about racial discrimination might have seized on one of the complainers' first workplace violations and punished this violation more severely than he would have otherwise.

### 2. Michael McKenna

We also conclude that Michael has tendered triable issues of fact as to whether his supervisors retaliated against him for his opposition to discrimination. Michael opposed Moroney's treatment of black officers from the moment Moroney arrived in October of 1997 and raised his criticisms to Moroney and to Moroney's supervisors in December 1997. In mid-February 1998, Michael was threatened, assaulted and transferred from the 25th District. There is evidence from which a factfinder could reasonably conclude that this series of events was caused by retaliatory animus.

Prior to the arrival of Moroney, Michael received various commendations and attention for his work as a police officer at the 7-squad. After Moroney's arrival, he lodged complaints to Moroney, Bachmeyer and Colarulo about his co-workers' conduct with regard to the piling-on scheme and the ensuing graffiti and with regard to Moroney's conduct as a supervisor toward black officers. His supervisors responded to the "snitch" graffiti by instituting policies and enforcing them. By contrast, Michael's criticism of Moroney's conduct toward black officers went unaddressed by all of his supervisors. The only reaction from his supervisors was Moroney assigning him to stand in the rain with black officer he was "punishing" so that Michael could "see how it's like to work with a nigger." In addition, Michael claims that Moroney treated him differently than other officers because of his complaints-testimony the factfinder would be entitled to believe. When Michael's brother made his comment on February 14, 1998, that Moroney "should be shot," Michael was swiftly removed from the 25th District. Michael overheard Moroney threaten to "kick [Michael's] ass" and "kick [William's] ass." Fifteen minutes later a fellow officer assaulted him.[FN7] After this incident, Colarulo transferred Michael from the 25th District for "his safety, the safety of others, and the safety of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                         Page 15

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

the public." App. at 1268. The officer who assaulted Michael and the supervisor that threatened him were not removed. In fact, the supervisor that threatened him gave Michael an unsatisfactory performance evaluation for not getting along with his supervisors-the first unsatisfactory evaluation in Michael's career. A reasonable jury could conclude from these facts that the threat, the assault, and the decision to transfer Michael was motivated by a desire to silence Michael's vocal opposition to unlawful discrimination in the 7-squad. So, too, could a factfinder reasonably conclude that Michael's protection served as convenient pretext to silence this critic.

*14 Michael argues that a jury could consider his transfer to be a materially adverse action and we agree. As we have explained, the Supreme Court has now clarified that where unlawful retaliation is claimed, the plaintiff need only show that an action is "materially adverse" in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.,* 126 S.Ct. at 2415. In *Burlington Northern,* the Court applied this test to find that a reassignment of a worker to a position with the same job description, but with less desirable duties, was a materially adverse action. *Id.* at 2416 ("Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee ... from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."). Michael introduced newspaper articles, commendations, and letters from citizens praising his work as a police officer in the 25th District. Moroney recognized Michael's reputation within the community in his evaluation, where he admitted that Michael had established good relations with the individuals in his assigned area. We find that a reasonable jury could conclude that a lateral transfer from the district where a police officer had earned goodwill and built positive relations with the community over time is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad.

As in William's case, we find that the evidence of retaliatory animus in this case would allow Michael to overcome non-retaliatory reasons proffered by the defendants for these actions. A jury could well conclude that these actions were more likely than not taken for retaliatory reasons. The evidence of retaliatory animus-without Colarulo's "living nightmare" threat [FN8]-is not as strong as in William's case. However, the reason offered by Michael's employer for his transfer is also not as strong as in William's case. Colarulo explained that "[Michael] was detailed out of the 25th District for his safety, the safety of others, and the safety of the public." App. at 1268. However, given Moroney's threat "to kick Michael's ass" and the fact that neither the officer who assaulted Michael nor the supervisor who threatened the assault was transferred or otherwise disciplined, a jury could reasonably disbelieve this proffered reason.

### C. Raymond Carnation

Raymond Carnation has also produced evidence from which a factfinder could reasonably conclude that his supervisors at the 7-squad engaged in a pattern of harassment against him to retaliate for his opposition to discrimination. Within two weeks of Colarulo's threat to make Carnation's life a living nightmare, Colarulo had separated Carnation from his two allies in the squad-a squad of officers that had previously identified him as a "rat" and "snitch" along with William and Michael. Carnation subsequently recalled numerous incidents of harassment-not receiving a court notice from Moroney without explanation, being told Moroney was "out to get" him .... etc. Moreover, the record is susceptible of the interpretation that Carnation was falsely disciplined for attempting to contact his supervisors on Memorial Day weekend and that Colarulo thereafter became involved in Carnation's custody battle with the mother of his child. We believe a reasonable jury might well conclude that this pattern of harassment might dissuade a reasonable worker from bringing or supporting a charge of discrimination. As in William's case, we further find that the unusually strong evidence of retaliatory animus-Colarulo's direct threat to Carnation-would allow a factfinder to conclude that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                          Page 16

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

retaliatory animus was more likely than not the motivating reasons for Carnation's supervisor's actions and, thus, that he survives the final step of the *McDonnell Douglas* test.

V.

**\*15** By finding that each plaintiff has tendered triable issues as to whether they suffered unlawful retaliation, we do not mean to suggest that every action for which the plaintiffs have sought to recover in their lawsuits is actionable under Title VII. These plaintiffs have cast their net wide, including many workplace wrongs for which Title VII may not provide relief. As noted above, "[m]any may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir.2006). The *prima facie* case serves "to identify what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* at 449-50.

A. Co-worker Harassment

[9][10][11] All three plaintiffs sought to recover for harassment visited upon the plaintiffs by co-workers. We agree with the District Court insofar as it held that Title VII does not provide liability for this conduct on this record. An employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers only if the *prima facie* case is satisfied and if there is a basis for employer liability for the coworker's conduct. *Jensen*, 435 F.3d at 449. "When co-workers are the perpetrators [of the harassment], the plaintiff must prove employer liability using traditional agency principles." *Id.* at 452. There is such a basis for liability where supervisors "knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action" to stop the abuse. *Id.* at 453.

In this case, the nature of the harassment visited by co-workers on the plaintiffs cannot be reasonably linked to a retaliatory animus; in fact, the timing and the nature of the abuse forecloses this conclusion. The plaintiffs were called "rats" and "snitches." Michael was called these names immediately after he reported the "piling on" scheme to Moroney. William and Carnation were called these names after they relayed numerous complaints about fellow officers to Moroney and supervisors took some actions in response-rationing radios and cars, instructing officers not to interfere with radio traffic, taking action against graffiti ... etc. Far from supporting an inference that they were being "rats" or "snitches" for allying with African-American officers, the facts of this case depict three officers who were harassed by co-workers because of their perceived allegiance to a racist manager, not their opposition to him. For William and Carnation, the nature of their early complaints also suggests an initial allegiance to Moroney. William described initially "trying to forewarn [Moroney] about" a fellow officer calling him a racist and Carnation described his role in reporting problems to Moroney as a "middle man." App. at 310, 898. Most important, during the period in which they were called "rats" and "snitches," the plaintiffs identify no evidence from which a factfinder could infer that their co-workers were aware that they had complained about racial tensions at the squad or about Moroney's treatment of black officers. This record reveals no link between the actions taken by the plaintiffs' co-workers and the requisite intent to retaliate for opposing discrimination made unlawful by Title VII.

**\*16** The plaintiffs argue their supervisors retaliated against them by acquiescing in the harassment they were receiving from co-workers; that management's acquiescence was retaliatory, even if the harassment was not. They argue that if "a particular worker has a nervous condition or hearing problem that makes him miserable when exposed to music for extended periods" the employer could be found to retaliate "by exploiting this vulnerability, moving him from a quiet office to one where Muzak plays constantly." *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir.2005). We agree that an employer may be liable if management "knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action," *see Jensen*, 435 F.3d at 453, and the satisfaction of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----   Page 17

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

elements of the *prima facie* case permits the inference that management's failure to intervene was caused by retaliatory intent. *Id.* at 449 n. 2. But this record does not support a reasonable conclusion that the plaintiffs' supervisors failed to take adequate remedial action in response to the "rat" and "snitch" graffiti and comments. While "[a]n effective remedy-one that stops the harassment-is adequate per se ... [e]ven if not effective, an employer's remedial measure is nonetheless adequate if 'reasonably calculated' to end the harassment." *Id.* at 453 (internal citations omitted). The defendants list numerous policies that Moroney, Colarulo, and Bachmeyer enacted and enforced to deal with the plaintiffs being described as "rats" and "snitches" by other officers over the radio, on paperwork, and in bathroom graffiti. Br. Appellee at 45. On this record, the supervisors' responses to co-worker abuse identified by the defendants, and not directly disputed by the plaintiffs, appear to be "reasonably calculated to end the harassment" and thus, the supervisors could not be reasonably faulted for failing to protect plaintiffs as a means of retaliating against them.

### B. Pre-December 1997 Conduct: William and Carnation

[12] For William and Carnation, to the extent that they complain of decisions by their supervisors prior to December 1997, the record reveals no triable issue of fact under Title VII. William and Carnation's complaints prior to December 1997 are not clear enough to sustain a finding that they were "opposing" unlawful discrimination. As earlier noted, "opposition" to unlawful discrimination cannot be equivocal. *See Barber,* 68 F.3d at 702. In their early conversations with supervisors, William and Carnation describe merely reporting the existence of racial problems. William described his first conversations with Moroney as "trying to forewarn him about" a fellow officer calling him a racist. App. at 310. Carnation described their first meetings with Moroney as follows:
What I said was just that Carla and Bruce feel like your not talking to them. They're not getting a fair deal. Things like that. We didn't argue. I didn't say anything that he's right or wrong. And that's basically what it was. I was just trying to be the middle man just to resolve this.

*17 App. at 898. In October and November of 1997, William and Carnation's reports about racial problems in the squad to Bachmeyer and Colarulo seem similarly neutral. If litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it-not just objectively reported its existence or attempted to serve as an intermediary. [FN9] While Colarulo's comments are revealing about management's view of the plaintiffs in February of 1998 and perhaps earlier than that, a jury could not reasonably infer that Colarulo formed those opinions when William and Carnation were merely reporting the existence of a problem.

### C. Post-February 1998 Conduct: William

In addition to the treatment he received from his supervisors at the 7-squad, William also argues that two other actions taken by the Philadelphia Police Department were unlawful retaliation-the cancellation of his restricted duty on November 4, 1998 and the constant sick checks he endured in March through May of 1999. For both, William relies on the timing of these actions as allowing a reasonable jury to infer that they were motivated by retaliatory animus. As of February 17, 1998, William was transferred to another district and there is no evidence that Colarulo continued to play a role in supervising William. A factfinder could not reasonably impute Colarulo's expression of retaliatory intent to the entire police department. [FN10] Thus, for subsequent actions taken against William to be actionable, there must be an independent basis for the inference of retaliatory animus. To the extent that William relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, *see Fasold v. Justice,* 409 F.3d 178, 190 (3d Cir.2005) ("[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."), he will have to show as well that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.