--- F.3d ----                                                                                          Page 18

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

decision maker had knowledge of the protected activity, *see Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) ("[Plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [defendant's] *receipt of notice* of [plaintiff's] EEOC claim.") (emphasis added).

William points out that he was removed from restricted duty on November 4, 1998, the very day that his brother, Michael, filed a civil rights lawsuit against the police department. Filing a civil rights lawsuit is clearly protected conduct under Title VII, and in the circumstances of this case, retaliating against William for Michael's lawsuit might well be actionable. FN11 William, however, points to no evidence to show that the police department was aware of Michael's lawsuit prior to taking this action. It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware. Nor is it a fair inference that the decision maker that cancelled William's restricted duty was aware of Michael's lawsuit based merely on the filing date.

**\*18** William also claims that the Police Department retaliated against him by abusively subjecting him to "sick checks" when he was on medical leave. William received three sick checks in his first five months of medical leave. In the two months after he filed his federal lawsuit, he was subjected to over 30 sick checks-approximately one every other day until he was eventually dismissed for failing sick checks. Here, we find that "temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn" by the factfinder. *See Fasold,* 409 F.3d at 190. The defendants do not dispute that the Police Department would have been aware of William's publicized filing of the lawsuit on March 5, 1999. The striking difference in the application of the sick-check policy before and after the date William filed his lawsuit would support an inference that it was caused by retaliatory animus. *See Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997) ( "[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). In addition, enforcing the sick check policy so vigorously would allow a jury to conclude that the disparate application of this policy "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.,* 126 S.Ct. at 2415. Finally, the disparate application of this policy is sufficiently suggestive of retaliatory animus, that we find that a factfinder could reasonably disbelieve the government's proffered legitimate, non-retaliatory reason for the sick-checks and reasonably believe that retaliatory animus motivated the disparate application of the sick-check policy. FN12

VI.

These three police officers have sought to recover for a long, unpleasant experience working at the Philadelphia Police Department. We find that a jury might well believe that their supervisors made their lives the "living nightmare" one supervisor promised as payment for opposing unlawful discrimination. It is true enough that only a portion of that nightmare can be attributed to a desire to retaliate against them and that only a portion of their experience is redressable by Title VII. These officers have claimed many wrongs by many foes for many reasons. But this cannot obscure the fact that a jury might properly conclude that some of those wrongs by some of those foes were intended to silence the plaintiffs from identifying and opposing unlawful discrimination in the Philadelphia Police Department. Because these plaintiffs have shown genuine issues of material fact as to whether they suffered retaliation made unlawful by Title VII, we will reverse the District Court's blanket grant of summary judgment and remand for proceedings consistent with this opinion.

FN* Hon. Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

FN1. The hierarchy in police departments,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 19

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

in order of rank, is: rank-and-file officers, corporals, sergeant, lieutenants, and captains.

FN2. While the plaintiffs' supervisors are before us as appellees, they make no argument in support of the judgment in their favor which is independent of the grounds for affirmance advanced by the City. Accordingly, we will address only issues relating to the Title VII liability of the City.

FN3. See *Childress v. City of Richmond,* 134 F.3d 1205 (4th Cir.1998) *(en banc);* see also *Caver v. City of Trenton,* 420 F.3d 243 (3d Cir.2005).

FN4. The defendants argue that these complaints about discrimination were obscured by numerous complaints about various managerial issues unrelated to racial issues. This does not affect our analysis of whether the plaintiffs engaged in protected conduct. Opposition to discrimination does not need to stand separate and apart from any other criticism of management in order to be entitled to protection under the anti-retaliation provision. As discussed *infra,* a factfinder could find that the employer's actions were a response to complaints about racial issues, rather than the other complaints.

FN5. It is undisputed that Michael did not make Colarulo's "make your life a living nightmare" statement to Carnation part of the record in his case before the District Court. On appeal, Michael argues that district courts are "entitled to take judicial notice of the facts of [a] decision" in related litigation. See *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 278 n. 7 (3d Cir.1999). This proposition does not support his asking this Court to reverse a District Court judgment based on facts not tendered to the District Court. Michael is essentially asking us to reverse the District Court for failing to take judicial notice of facts *sua sponte.* We normally do not consider facts outside of the District Court record, *Clark v. K-Mart Corp.,* 979 F.2d 965, 967 (3d Cir.1992) (en banc), because the "proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court." *Fassett v. Delta Kappa Epsilon (New York),* 807 F.2d 1150, 1165 (3d Cir.1986). In fact, Michael would not have had to employ judicial notice to place this evidence before the District Court. This conversation was produced in consolidated discovery and available for him cite in his opposition to the defendant's motion for summary judgment. He did not do so, and we may not consider this evidence in his appeal.

Given that retaliatory animus is often difficult to prove, omitting this evidence is curious; but we find that it is not fatal. As discussed below, on the evidence in the record, a reasonable jury could conclude that actions taken against Michael were prompted by his opposition to Moroney's discriminatory management without reference to Colarulo's express vow to retaliate.

FN6. If a white supervisor told white employees that he fired someone because he was black or harassed someone because she was female, it would not matter that this comment was made outside of earshot of the victim or that the employee did not actually witness the firing or the harassment. Contrary to the view of the District Court, racial epithets of which the targets were not aware may very well form the basis for a reasonable belief that discrimination has occurred or was occurring, depending on the circumstances. When offered for the purpose of showing what the employee reasonably believed, the employee's account of the supervisor's statement would not be hearsay. F.R. Evid. 803(3).

FN7. It is true that a fellow officer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                Page 20

--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378
(Cite as: --- F.3d ----)

assaulted Michael, rather than Mahoney himself. "When coworkers are the perpetrators [of retaliatory harassment], the plaintiff must prove employer liability using traditional agency principles." *Jensen*, 435 F.3d at 452. Plaintiffs often establish liability by showing supervisory negligence-that "management knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Id.* at 453 (internal quotation marks omitted). For the assault, however, the link here is not so tenuous because there is evidence to suggest that Mahoney openly endorsed the assault to a squad that already deeply disliked the victim and the assault occurred 15 minutes later. A jury could reasonably conclude that Michael's supervisor instigated the assault.

The defendants do not directly question imposing liability for the assault based on Moroney's threat. Instead, they point to certain admissions made by Michael as foreclosing imposing liability for the assault or transfer. *See* Br. Appellee at 41, 43. We do not find the statements defendants identify, when read in context and in the light most favorable to Michael, to be conclusive.

FN8. *See* footnote 5, *infra*.

FN9. The same cannot be said of Michael, who sparred with Moroney at every turn from the moment Moroney arrived in October of 1997.

FN10. To the extent that Michael sought redress for certain actions taken against him after he transferred from the 25th District, we find that the argument fails for similar reasons.

FN11. William asks us to "revisit" the holding of *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 568 (3d Cir.2002) to the extent that the case stands for the proposition that Title VII's anti-retaliation provision does not bar actions taken against the family members of an employee who engages in protected activity. Br. Appellant at 43-44. There is no reason to confront this issue. That case confronted the issue of whether Title VII "make[s] actionable retaliation against someone who has not himself engaged in protected conduct." *Fogleman*, 283 F.3d at 568. In this case, Michael and William are not just brothers. They are co-whistle blowers. They both engaged in protected conduct. Both filed an EEOC complaint together in April-a fact mentioned in Michael's complaint filed on November 4, 1998. William was a likely witness for Michael at trial. We do not need to revisit the holding of *Fogleman* to find that an employer cannot retaliate against one whistle-blower by taking actions against an ally who is blowing the whistle on the same conduct.

FN12. The defendants offer as a non-retaliatory reason for the sick checks the departmental policy directing that sick checks be made of officers on medical leave. This does not explain the application of this policy-specifically, the sudden increase in regularity of sick checks after William filed his lawsuit. Nor does William's failures of sick checks evince a pattern that may explain this increase. William failed sick checks on 11/9/98, 2/3/99, and 2/4/99. This does not explain why the department would start performing sick checks once every other day starting in March, 1999, soon after William filed his lawsuit. A jury could reasonably disbelieve this proffered explanation.

The defendants also argue that this issue was waived. We disagree. *See* App. at 862-63.

C.A.3 (Pa.),2006.
Moore v. City of Philadelphia
--- F.3d ----, 2006 WL 2492256 (C.A.3 (Pa.)), 98 Fair Empl.Prac.Cas. (BNA) 1378

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.